## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 30 2016, 9:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Marqwan D. Beserra,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | December 30, 2016<br><br>Court of Appeals Case No.<br>71A03-1606-CR-1369<br><br>Appeal from the St. Joseph<br>Superior Court<br><br>The Honorable John Marnocha,<br>Judge<br><br>Trial Court Cause No.<br>71D02-1506-MR-6 |

**Riley, Judge.**

STATEMENT OF THE CASE

Appellant-Defendant, Marqwan D. Beserra (Beserra), appeals his conviction for murder, a felony, Ind. Code § 35-42-1-1(1) (2014).

We affirm.

## ISSUE

Beserra raises one issue on appeal, which we restate as follows:  Whether the State presented sufficient evidence to negate Beserra's claim of self-defense beyond a reasonable doubt.

## FACTS AND PROCEDURAL HISTORY

On the afternoon of June 9, 2015, eighteen-year-old Beserra went to the home of Chanel Partee (Partee), located at 2434 Fredrickson Street in South Bend, St. Joseph County, Indiana.  At the time, Beserra was intermittently living with Partee.  Partee, who had previously dated Beserra's father for several years, knew Beserra since his childhood, and Beserra considered Partee to be a mother-figure.  On that day, a number of Partee's friends were also present at Partee's home, including Roesha Mohead (Mohead) and Dominique Walker (Walker).

Mohead was in the midst of having her hair styled by Walker when Jerry Wright (Wright), her former boyfriend and the father of her two-year-old child, arrived at Partee's house to continue an ongoing argument with Mohead. Wright and Mohead's conversation quickly became heated.  Due to the

escalating nature of the quarrel, Partee intervened, which prompted Wright to respond to Partee with a disrespectful comment. Upon hearing Wright's remark to Partee, Beserra emerged and challenged Wright's rudeness. Beserra and Wright had a history consisting of verbal altercations and severe tension over purported displays of disrespect. According to Beserra, on two previous occasions, Wright had displayed a handgun to Beserra.

[6] The situation between Beserra and Wright rapidly intensified, and the two were "in each other's face." (Tr. p. 333). Partee, in an effort to prevent a fight in her living room, escorted Beserra and Wright outside, where she instructed them to go their separate ways. Instead, Beserra and Wright continued to stand in the middle of the street hurling slurs at one other. Wright invited Beserra to fight, but Beserra stated that he would not fight "while he's got [his] tool." (Tr. p. 427). Beserra also informed Wright that "this is not what you want, I ain't the one to play with." (Tr. p. 467). There is *significant* discrepancy among the witnesses as to what occurred next, but it is undisputed that, at some point, Wright walked over to his vehicle, a white SUV, and when he turned back around toward Beserra, Beserra fired six shots from a nine millimeter handgun, striking Wright with each shot.

[7] Mohead stated that when she heard the gunshots, she ran outside and witnessed Beserra, with his gun in hand, as he fled through the alley. She also observed Wright to be weaponless as he stumbled and fell to the ground. Mohead rushed to Wright's side and did not notice any firearms nearby. Conversely, according to one of Partee's friends who witnessed the shooting, Yjuannia Manns

(Manns), Beserra and Wright both had a gun in hand while arguing in the street. However, Manns added that when Wright invited Beserra to "[f]ight [him] one on one," Wright very clearly stowed his gun in his SUV and never went back to retrieve it. (Tr. p. 368). Partee offered a third version of events, stating that upon Beserra's indication that he would not engage in a fistfight while armed with his "tool," Wright retrieved a gun from his SUV, at which time Beserra fired his weapon. (Tr. p. 427). Yet, when Partee went to check on Wright, she stated that she did not observe a gun. Lastly, Beserra proffered that during their verbal altercation, Wright suggested a fistfight and, although Wright had not displayed a firearm up to that point, he walked over to his SUV and placed a gun inside. Beserra claimed to have stated, "Man, I'm not going to fight you while I got this gun on me." (Tr. p. 468). As such, Wright purportedly returned to the SUV to retrieve the firearm, and as Wright turned around with a gun in hand, Beserra fired his own weapon and "kept shooting 'til he fell on the ground, then I seen [Wright's] gun fall on the ground." (Tr. p. 469).

[8] After he fired the sixth shot and watched Wright fall to the ground, Beserra fled the area and discarded the gun a few blocks away. Emergency personnel responded to Partee's house, but by the time they arrived, Wright did not have a pulse and officers heard "death rattle" breathing. (Tr. p. 202). Wright was transported to the hospital and life-saving measures were attempted, but he did not survive. During their investigation, the South Bend Police Department and the St. Joseph County Metro Homicide Unit recovered several bullet fragments

and six shell casings from a nine millimeter semi-automatic handgun, but no firearms were ever discovered. The police officers interviewed Mohead, who identified Beserra as the shooter and provided the officers with a photograph of Beserra that she found on Facebook. On the other hand, Partee offered a description of Beserra but indicated that she was not aware of his identity. Similarly, Manns told officers that she did not know the shooter's identity and further indicated that she did not witness the shooting because she was checking her Facebook account. Neither Partee nor Manns informed the officers that they had observed Wright with a firearm.

[9] On June 10, 2015, the State filed an Information, charging Beserra with one Count of murder, a felony, I.C. § 35-42-1-1(1) (2014). In September of 2015, Beserra, who had absconded after the shooting, was found and arrested in Atlanta, Georgia. On November 4, 2015, Beserra filed a notice of his intent to claim the use of justifiable force (*i.e.*, self-defense) as a defense. On April 18 through April 21, 2016, the trial court conducted a jury trial. At the close of the evidence, the jury returned a guilty verdict, and the trial court entered a judgment of conviction for one Count of murder. On May 20, 2016, the trial court held a sentencing hearing and ordered Beserra to execute sixty years in the Indiana Department of Correction.

[10] Beserra now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Beserra claims that the State failed to present sufficient evidence to disprove his claim of self-defense. When reviewing a challenge to the sufficiency of evidence with respect to rebutting a claim of self-defense, our court relies on the same standard as in any other sufficiency of the evidence claim. *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002). Accordingly, we do not reweigh evidence or assess the credibility of witnesses. *Id.* Instead, so long as "there is sufficient evidence of probative value to support the conclusion of the trier of fact, . . . the verdict will not be disturbed." *Id.* "If a defendant is convicted despite his claim of self-defense, this [c]ourt will reverse only if no reasonable person could say that self-defense was negated by the State beyond a reasonable doubt." *Id.* at 800-01.

### II. *Self-Defense*

In this case, there is no dispute that Beserra "knowingly or intentionally kill[ed]" Wright. I.C. § 35-42-1-1(1). Nevertheless, the Indiana General Assembly has explicitly declared "that it is the policy of this state that people have a right to defend themselves and third parties from physical harm and crime." I.C. § 35-41-3-2(a). Thus, "[a] valid claim of self-defense is legal justification for an otherwise criminal act." *Hood v. State*, 877 N.E.2d 492, 496 (Ind. Ct. App. 2007), *trans. denied*. In order "to provide the citizens of this state with a lawful means of carrying out this policy," Indiana statute stipulates:

> A person is justified in using reasonable force against any other person to protect the person or a third person from what the person reasonably believes to be the imminent use of lawful force. However, a person:
>> (1) is justified in using deadly force; and
>> (2) does not have a duty to retreat;
>
> if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony. No person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary.

I.C. § 35-41-3-2(a),(c).

[13] In raising a claim of self-defense, "the defendant must present evidence that he: (1) was in a place he had a right to be, (2) did not provoke, instigate, or participate willingly in the violence, and (3) had a reasonable fear of death or great bodily harm." *Tharpe v. State*, 955 N.E.2d 836, 844 (Ind. Ct. App. 2011), *trans. denied*. If the defendant is the initial aggressor or a mutual combatant, "he must withdraw from the encounter and communicate the intent to do so to the other person before he may claim self-defense." *Id. See* I.C. § 35-41-3-2(g)(2)-(3) (providing that a person is not justified in using force if he provokes unlawful action of another individual with an intent to cause bodily injury to that individual, or if the person has entered into combat with another individual or is the initial aggressor and does not withdraw from the encounter). Once a defendant raises a claim of self-defense, the State bears the burden of disproving at least one of the necessary elements beyond a reasonable doubt in order for the defendant's claim to fail. *Hood*, 877 N.E.2d at 497.

The State may meet this burden by rebutting the defense directly, by affirmatively showing the defendant did not act in self-defense, or by simply relying upon the sufficiency of its evidence in chief. Whether the State has met its burden is a question of fact for the factfinder. The trier of fact is not precluded from finding that a defendant used unreasonable force simply because the victim was the initial aggressor.

*Id.* (internal citations omitted).

### III. *Sufficiency of the State's Evidence*

On appeal, Beserra asserts that he was in a place where he was entitled to be, and although he engaged in a verbal altercation with Wright, he left the house and claims that his intent was to leave the area, but that "Wright would not leave him alone." (Appellant's Br. p. 8). Beserra further contends that

> [i]t was only after Beserra had refused to fight Wright, had told Wright that he was carrying a gun, and then saw Wright go back to his truck and rearm himself that he began shooting. It certainly cannot be said that at that time Beserra would not have had a reasonable apprehension that Wright was going to continue the fight, only this time with his gun. Of course it is axiomatic that when one is concerned about being on the receiving end of a gun that person is in fear of either serious bodily injury or death.

(Appellant's Br. pp. 8-9). Beserra also asserts that Wright should have gotten into his SUV and driven away before the altercation escalated.

We agree that the evidence establishes that Beserra "was in a place he had a right to be," as the event unfolded on a public street. *Tharpe*, 955 N.E.2d at

844. However, we find ample evidence in the record to support a determination by the fact-finder that Beserra participated willingly in the fight and that he lacked a reasonable fear of death or great bodily harm. *See id.* First, as to his voluntary participation, Beserra engaged Wright in a verbal altercation after Wright made a disrespectful remark to Partee. When Partee escorted the men outside, they continued to be "in each other's face." (Tr. p. 335). Although Beserra attempts to shift the blame to Wright for continuing with the argument instead of driving away, Beserra himself had ample opportunity to walk away but chose not to do so. Instead, when Wright sought a fistfight, Beserra made it known that he was armed and warned Wright that he "ain't the one to play with." (Tr. p. 467).

[16] Moreover, there is sufficient evidence that Beserra did not possess a reasonable fear of death or great bodily harm. In fact, he explicitly testified that he was not scared of Wright. Nonetheless, Beserra claims that although Wright never brandished a firearm during their altercation, he saw Wright stow a firearm in his SUV at the time that Wright suggested that they "ain't gotta use no guns, we can just fight." (Tr. p. 468). Thereafter, when Beserra indicated that he would not "fight [Wright] while I got this gun on me," Beserra testified that Wright "went back to the [SUV] to go get his gun," and "when he came back out with the gun and he came around . . . as he turned around, the gun was out. And I just shot him, and I kept shooting 'til he fell on the ground, then I seen the gun fall on the ground." (Tr. pp. 468-69).

[17] Beserra's testimony directly contradicts Mohead's testimony, who stated that she never saw a gun in Wright's hands and that there was no firearm near him when she rushed to his side following the shooting. Furthermore, the investigating officers never recovered a weapon—specifically, no gun was found near Wright or on his person, nor in his vehicle or in or around Partee's home. While Partee and Manns testified that they observed Wright with a gun, the jury also learned that Partee and Manns admittedly lied to police during their initial interviews in an apparent attempt to protect Beserra from being discovered. Similarly, neither Partee nor Manns ever informed the officers that Wright had a gun on him. Accordingly, it was well within the discretion of the jury to discredit the testimony indicating that Wright was in possession of a gun at the time of the shooting. Given the fact that Wright was unarmed and that Wright had made it clear to Beserra that he wanted to settle the altercation with their fists, the evidence supports a finding that Beserra did not have a reasonable fear of death or great bodily harm.

## CONCLUSION

[18] Based on the foregoing, we conclude that the State presented sufficient evidence to rebut Beserra's claim of self-defense.

[19] Affirmed.

[20] Crone, J. and Altice, J. concur